Argued and submitted April 22, reversed and remanded October 1, 1997

# Joni MILLER,
*Appellant,*

*v.*

# McDONALD'S CORPORATION,
a foreign corporation,
*Respondent.*

(9507-05008; CA A91993)

945 P2d 1107

so.

Anthony A. Allen argued the cause and filed the briefs for appellant.

R. Daniel Lindahl argued the cause for respondent. With him on the brief were David A. Ernst and Bullivant, Houser, Bailey, Pendergrass & Hoffman.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

WARREN, P. J.

## WARREN, P. J.

Plaintiff seeks damages from defendant McDonald's Corporation for injuries that she suffered when she bit into a heart-shaped sapphire stone while eating a Big Mac sandwich that she had purchased at a McDonald's restaurant in Tigard. The trial court granted summary judgment to defendant on the ground that it did not own or operate the restaurant; rather, the owner and operator was a nonparty, 3K Restaurants (3K), that held a franchise from defendant. Plaintiff appeals, and we reverse.

Most of the relevant facts are not in dispute. To the degree that there are disputes, we read the record most favorably to plaintiff, the nonmoving party, and review the evidence to determine whether an objectively reasonable juror could return a verdict in her favor on the subject of the motion. ORCP 47 C; *see Jones v. General Motors Corp.*, 325 Or 404, 939 P2d 608 (1997).[1] 3K owned and operated the restaurant under a License Agreement (the Agreement) with defendant that required it to operate in a manner consistent with the "McDonald's System." The Agreement described that system as including proprietary rights in trade names, service marks and trademarks, as well as

> "designs and color schemes for restaurant buildings, signs, equipment layouts, formulas and specifications for certain food products, methods of inventory and operation control, bookkeeping and accounting, and manuals covering business practices and policies."

The manuals contain "detailed information relating to operation of the Restaurant," including food formulas and specifications, methods of inventory control, bookkeeping procedures, business practices, and other management, advertising, and personnel policies. 3K, as the licensee, agreed to adopt and exclusively use the formulas, methods, and policies contained in the manuals, including any subsequent

---

[1] Such factual disputes as there are appear to arise from testimony that 3K may have operated with greater flexibility than the License Agreement appears to contemplate. Because, as we discuss below, the crucial issue on actual agency is defendant's *right* to control, and because we resolve all disputes in favor of the nonmoving party, we will rely on the terms of the Agreement where they may conflict with 3K's testimony.

modifications, and to use only advertising and promotional materials that defendant either provided or approved in advance in writing.

The Agreement described the way in which 3K was to operate the restaurant in considerable detail. It expressly required 3K to operate in compliance with defendant's prescribed standards, policies, practices, and procedures, including serving only food and beverage products that defendant designated. 3K had to follow defendant's specifications and blueprints for the equipment and layout of the restaurant, including adopting subsequent reasonable changes that defendant made, and to maintain the restaurant building in compliance with defendant's standards. 3K could not make any changes in the basic design of the building without defendant's approval.

The Agreement required 3K to keep the restaurant open during the hours that defendant prescribed, including maintaining adequate supplies and employing adequate personnel to operate at maximum capacity and efficiency during those hours. 3K also had to keep the restaurant similar in appearance to all other McDonald's restaurants. 3K's employees had to wear McDonald's uniforms, to have a neat and clean appearance, and to provide competent and courteous service. 3K could use only containers and other packaging that bore McDonald's trademarks. The ingredients for the foods and beverages had to meet defendant's standards, and 3K had to use "only those methods of food handling and preparation that [defendant] may designate from time to time." In order to obtain the franchise, 3K had to represent that the franchisee had worked at a McDonald's restaurant; the Agreement did not distinguish in this respect between a company-run or a franchised restaurant. The manuals gave further details that expanded on many of these requirements.

In order to ensure conformity with the standards described in the Agreement, defendant periodically sent field consultants to the restaurant to inspect its operations. 3K trained its employees in accordance with defendant's materials and recommendations and sent some of them to training

programs that defendant administered. Failure to comply with the agreed standards could result in loss of the franchise.

Despite these detailed instructions, the Agreement provided that 3K was not an agent of defendant for any purpose. Rather, it was an independent contractor and was responsible for all obligations and liabilities, including claims based on injury, illness, or death, directly or indirectly resulting from the operation of the restaurant.

Plaintiff went to the restaurant under the assumption that defendant owned, controlled, and managed it. So far as she could tell, the restaurant's appearance was similar to that of other McDonald's restaurants that she had patronized. Nothing disclosed to her that any entity other than defendant was involved in its operation. The only signs that were visible and obvious to the public had the name "McDonald's,"[2] the employees wore uniforms with McDonald's insignia, and the menu was the same that plaintiff had seen in other McDonald's restaurants. The general appearance of the restaurant and the food products that it sold were similar to the restaurants and products that plaintiff had seen in national print and television advertising that defendant had run. To the best of plaintiff's knowledge, only McDonald's sells Big Mac hamburgers.

In short, plaintiff testified, she went to the Tigard McDonald's because she relied on defendant's reputation and because she wanted to obtain the same quality of service, standard of care in food preparation, and general attention to detail that she had previously enjoyed at other McDonald's restaurants.

Under these facts, 3K would be directly liable for any injuries that plaintiff suffered as a result of the restaurant's negligence. The issue on summary judgment is whether there is evidence that would permit a jury to find defendant vicariously liable for those injuries because of its relationship

---

[2] This is plaintiff's testimony in her affidavit. Representatives of 3K testified in their depositions that there was a sign near the front counter that identified Bob and Karen Bates and 3K Restaurants as the owners. There is no evidence of the size or prominence of the sign, nor is there evidence of any other non-McDonald's identification in the restaurant.

with 3K. Plaintiff asserts two theories of vicarious liability, actual agency and apparent agency. We hold that there is sufficient evidence to raise a jury issue under both theories. We first discuss actual agency.

 The kind of actual agency relationship that would make defendant vicariously liable for 3K's negligence requires that defendant have the right to control the *method* by which 3K performed its obligations under the Agreement. The common context for that test is a normal master-servant (or employer-employee) relationship. *See, e.g., Jenkins v. AAA Heating*, 245 Or 382, 386, 421 P2d 971 (1966); *Chard v. Beauty-N-Beast Salon*, 148 Or App 623, 628, 941 P2d 611 (1997). The relationship between two business entities is not precisely an employment relationship, but the Oregon Supreme Court, in common with most if not all other courts that have considered the issue, has applied the right to control test for vicarious liability in that context as well. *See Peeples v. Kawasaki Heavy Indust., Ltd.*, 288 Or 143, 603 P2d 765 (1979). We therefore apply that test to this case.[3]

In *Peeples*, the issue was whether a motorcycle distributor was liable for a dealer's allegedly negligent warranty service. The agreement between the distributor and the dealer gave the distributor the right to set standards governing the dealer's method of operation, service, and warranty repair, including to some extent the physical conduct of the dealer's employees in the performance of warranty work. The distributor could terminate the relation for a breach of those standards. The Supreme Court held that the record as a whole supported a finding that the distributor had the right to control the dealer's conduct in providing warranty service and, therefore, that the trial court properly submitted the issue of the distributor's vicarious liability to the jury. 288 Or at 149-50.

 A number of other courts have applied the right to control test to a franchise relationship. The Delaware Supreme Court, in *Billops v. Magness Const. Co.*, 391 A2d 196 (Del 1978), stated the test as it applies to that context:

---

[3] Under the right to control test it does not matter whether the putative principal actually exercises control; what is important is that it has the right to do so. *See Peeples v. Kawasaki Heavy Indust., Ltd.*, 288 Or 143, 149, 603 P2d 765 (1979).

"If, in practical effect, the franchise agreement goes beyond the stage of setting standards, and allocates to the franchisor the right to exercise control over the daily operations of the franchise, an agency relationship exists." 391 A2d at 197-98.

This statement expresses the general direction that courts have taken and is consistent with the Supreme Court's discussion in *Peeples*. We therefore adopt it for the purposes of this case.

As the various cases show, it may be difficult to determine when a franchisor has retained a right not only to set standards but also to control the daily operations of the franchisee. Two examples show the different conclusions that the courts have reached and provide some guidance for this case. In *Wood v. Shell Oil Co.*, 495 So 2d 1034 (Ala 1986), the franchise agreement required a Shell gasoline dealer to maintain the station premises, including the appearance, design, color, style, and layout, in accordance with Shell's specifications or recommendations, to promote the sale of the products that the dealer purchased, to require all employees to wear Shell uniforms, and to let Shell inspect its books. The dealer had to maintain a competent staff of employees and to perform all mechanical work in a workmanlike manner, using only first-class parts. Shell might offer supplemental training for the employees. The Alabama court held that the agreement did not establish actual agency because it did not control *how* the dealer complied with the requirements. *See also Chevron, U.S.A., Inc. v. Lesch*, 319 Md 25, 570 A2d 840 (1990); *Little v. Howard Johnson Co.*, 183 Mich App 675, 455 NW2d 390 (1990).

In contrast, in *Billops* the franchise agreement for a Hilton Inn hotel incorporated a detailed and, in part, mandatory operating manual that covered identification, advertising, front office procedures, cleaning and inspection service for rooms and public areas, minimum room standards, food purchasing and preparation standards, staff procedures and standards for booking group meetings, function, and room reservations, accounting, insurance, engineering, maintenance and numerous other details. The franchisee had to keep detailed records so that the franchisor could

ensure compliance with those guidelines, while the franchisor retained the right to enter the premises to ensure compliance. The franchisor could terminate on 20 days' notice for an uncorrected violation. The court held that those facts created a jury issue of whether an actual agency relationship existed. 391 A2d at 198. *See also Drexel v. Union Prescription Centers, Inc.*, 582 F2d 781 (3rd Cir 1978); *Singleton v. International Dairy Queen, Inc.*, 332 A2d 160 (Del Super 1975).

The essential distinction between *Wood* and *Billops* is the extent to which the franchisor retained control over the details of the franchisee's performance. In *Wood*, the franchisor required only that mechanical work be done in a workmanlike manner. In *Billops*, however, the franchisor issued a manual that described the methods by which the franchisee was to carry out its responsibilities in considerable detail. The agreement in *Wood*, thus, could only be read as providing standards that the franchisee had to meet, while the agreement in *Billops* could be read as retaining the right to exercise control over the franchisee's daily operations.

■ The facts of this case are close to those in *Billops*. For that reason, we believe that a jury could find that defendant retained sufficient control over 3K's daily operations that an actual agency relationship existed. The Agreement did not simply set standards that 3K had to meet. Rather, it required 3K to use the precise methods that defendant established, both in the Agreement and in the detailed manuals that the Agreement incorporated. Those methods included the ways in which 3K was to handle and prepare food. Defendant enforced the use of those methods by regularly sending inspectors and by its retained power to cancel the Agreement. That evidence would support a finding that defendant had the right to control the way in which 3K performed at least food handling and preparation. In her complaint, plaintiff alleges that 3K's deficiencies in those functions resulted in the sapphire being in the Big Mac and thereby caused her injuries. Thus, as in *Peeples*, there is evidence that defendant had the right to control 3K in the precise part of its business that allegedly resulted in plaintiff's injuries. That is sufficient to raise an issue of actual agency.

■■ Plaintiff next asserts that defendant is vicariously liable for 3K's alleged negligence because 3K was defendant's apparent agent.[4] The relevant standard is in *Restatement (Second) of Agency*, § 267, which we adopted in *Themins v. Emanuel Lutheran*, 54 Or App 901, 637 P2d 155 (1981), *rev den* 292 Or 568 (1982):

> "One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such." *See Themins*, 54 Or App at 908.

We have not applied section 267 to a franchisor/franchisee situation, but courts in a number of other jurisdictions have done so in ways that we find instructive. In most cases the courts have found that there was a jury issue of apparent agency. The crucial issues are whether the putative principal held the third party out as an agent and whether the plaintiff relied on that holding out.

We look first at what may constitute a franchisor's holding a franchisee out as its agent. In the leading case of *Gizzi v. Texaco, Inc.*, 437 F2d 308 (5th Cir), *cert den* 404 US 829 (1971), the plaintiff purchased a used Volkswagen van from a Texaco service station. He was injured when the brakes failed shortly thereafter. The franchisee had worked on the brakes before selling the car. The station prominently displayed Texaco insignia, including the slogan "Trust your car to the man who wears the star." Texaco engaged in considerable national advertising to convey the impression that its dealers were skilled in automotive servicing. About 30 percent of Texaco dealers sold used cars. There was a Texaco regional office across the street from the station, and those

---

[4] Apparent agency is a distinct concept from apparent authority. Apparent agency creates an agency relationship that does not otherwise exist, while apparent authority expands the authority of an actual agent. *See Crinkley v. Holiday Inns, Inc.*, 844 F2d 156, 166 (4th Cir 1988). In this case, the precise issue is whether 3K was defendant's apparent agent, not whether 3K had apparent authority. However, because courts in Oregon and elsewhere often use the terms interchangeably, *see, e.g., Badger v. Paulson Investment Co., Inc.*, 311 Or 14, 24, 803 P2d 1178 (1991); *Gizzi v. Texaco, Inc.*, 437 F2d 308, 309 (3d Cir), *cert den* 404 US 829 (1971); *Williams v. Inverness Corp.*, 664 A2d 1244, 1246-47 (Me 1995), we will treat the parties' arguments as based on apparent agency, whichever term they actually use.

working in that office knew that the franchisee was selling cars from the station. Based on this evidence, the court concluded, under New Jersey law, that the question of apparent agency was for the jury.[5]

In *Singleton*, the plaintiff's daughter was injured when a glass door at a Dairy Queen restaurant broke as she was trying to open it. Under the franchise agreement, the owner of the restaurant had to build it according to the defendant's standards and could display only "Dairy Queen" as the store's trade name. He was also required to follow the defendant's standards in the conduct of his business, to require all employees to wear Dairy Queen uniforms, and to use advertising cartons and containers marked as being used under the defendant's authority. The court held that there was an issue of fact whether the franchisee was an apparent agent of the defendant.

In *Billops*, the franchise agreement required the franchisee to display the Hilton logo and sign to the exclusion of all others, forbade the mention of any name other than Hilton as the management of the Hotel, and required the franchisee to identify itself with the Hilton "system," including the color scheme and design of the hotel. There was no reasonable way, based on the method of operation or physical environment of the hotel, by which an ordinary customer would know that he or she was dealing with anything other than the Hilton Corporation. The Delaware Supreme Court held that that evidence was sufficient to support a finding of apparent agency.

In *Crinkley v. Holiday Inns, Inc.*, 844 F2d 156 (4th Cir 1988), the defendant required the use of the Holiday Inn trade name and trademarks, was the original builder of the hotel, and engaged in national advertising that promoted its system of hotels without distinguishing between those that it owned and those that it franchised. The only indication that

---

[5] In *Shadel v. Shell Oil Co.*, 195 NJ Super 311, 478 A2d 1262 (1984), the court expressly adopted *Gizzi* as a correct statement of New Jersey law. It held that a jury could find Shell liable, based on apparent agency, for a station employee's assault on a customer. The station was identified as a Shell station, its employees wore Shell uniforms, and the customer believed that Shell operated the station and had no reason to know that it was under the control of an independent franchisee.

the defendant did not own this particular Holiday Inn was a sign in the restaurant that stated that the franchisee operated it. Based on this evidence, the court concluded, under North Carolina law, that apparent agency was a question for the jury.

In each of these cases, the franchise agreement required the franchisee to act in ways that identified it with the franchisor. The franchisor imposed those requirements as part of maintaining an image of uniformity of operations and appearance for the franchisor's entire system.[6] Its purpose was to attract the patronage of the public to that entire system. *See also Drexel*, 582 F2d at 795-96. The centrally imposed uniformity is the fundamental basis for the courts' conclusion that there was an issue of fact whether the franchisors held the franchisees out as the franchisors' agents.

■■ In this case, for similar reasons, there is an issue of fact about whether defendant held 3K out as its agent. Everything about the appearance and operation of the Tigard McDonald's identified it with defendant and with the common image for all McDonald's restaurants that defendant has worked to create through national advertising, common signs and uniforms, common menus, common appearance, and common standards. The possible existence of a sign identifying 3K as the operator does not alter the conclusion that there is an issue of apparent agency for the jury. There are issues of fact of whether that sign was sufficiently visible to the public, in light of plaintiff's apparent failure to see it, and of whether one sign by itself is sufficient to remove the impression that defendant created through all of the other indicia of its control that it, and 3K under the requirements that defendant imposed, presented to the public.[7]

Defendant does not seriously dispute that a jury could find that it held 3K out as its agent. Rather, it argues

---

[6] Indeed, the franchisor may need to take some of these steps in order to preserve Lanham Act protection for its trademarks. *See* Anno., *Franchisor's Tort Liability for Injuries Allegedly Caused by Assault or other Criminal Activity on or Near Franchise Premises*, 2 ALR5th 369, 376-77 (1992).

[7] In addition, operation of the restaurant by a franchisee is not inconsistent as a matter of law with a finding of agency. An agency relationship necessarily requires that the principal and the agent be separate entities.

that there is insufficient evidence that plaintiff justifiably relied on that holding out. It argues that it is not sufficient for her to prove that she went to the Tigard McDonald's because it was a McDonald's restaurant. Rather, she also had to prove that she went to it because she believed that *McDonald's Corporation* operated both it and the other McDonald's restaurants that she had previously patronized. It states:

> "All [that] the Plaintiff's affidavit proves is that she went to the Tigard McDonald's based in reliance on her past experiences at other McDonald's. But her affidavit does nothing to link her experiences with ownership of those restaurants by McDonald's Corporation."

Defendant's argument both demands a higher level of sophistication about the nature of franchising than the general public can be expected to have and ignores the effect of its own efforts to lead the public to believe that McDonald's restaurants are part of a uniform national system of restaurants with common products and common standards of quality. A jury could find from plaintiff's affidavit that she believed that all McDonald's restaurants were the same because she believed that one entity owned and operated all of them or, at the least, exercised sufficient control that the standards that she experienced at one would be the same as she experienced at others.

Plaintiff testified in her affidavit that her reliance on defendant for the quality of service and food at the Tigard McDonald's came in part from her experience at other McDonald's restaurants. Defendant's argument that she must show that it, rather than a franchisee, operated those restaurants is, at best, disingenuous. A jury could find that it was defendant's very insistence on uniformity of appearance and standards, designed to cause the public to think of every McDonald's, franchised or unfranchised, as part of the same system, that makes it difficult or impossible for plaintiff to tell whether her previous experiences were at restaurants that defendant owned or franchised.

Other courts have not required the specificity of reliance on which defendant insists. In *Crinkley*, the plaintiffs stayed at a Holiday Inn because they thought that it would be a good place to stay. They were unable to get a room at the

first Holiday Inn that they tried and used a Holiday Inn directory to find the one where they did stay. One plaintiff testified that he did not know the difference between a franchised inn and a company-owned inn and would be greatly surprised to find that Holiday Inns (the franchisor) was not involved in the operation of the inn where he stayed. The court held that that evidence was sufficient to raise a jury issue of reliance. 844 F2d at 167.

In *Orlando Executive Park, Inc. v. P.D.R.*, 402 So 2d 442 (Fla App 1981), the court concluded that there was sufficient evidence that the plaintiff relied on the franchisor when she decided to stay at a Howard Johnson motel. She specifically called the Howard Johnson Motor Lodge, not just any motel. She was unaware that any Howard Johnson motel was locally owned but assumed that " 'they were Howard Johnson's.' " The court held that the jury could conclude that the plaintiff believed exactly what the franchisor wanted her to believe, "that she was dealing with Howard Johnson's, 'a chain that sells a product across the nation.' " That understanding, "coupled with the evidence of the extensive efforts of HJ to market a uniform product," was sufficient to create a jury issue of reliance. 402 So 2d at 451.

In *Billops* there was evidence that the plaintiffs relied on the Hilton name and on the quality that the name represented. That was sufficient to avoid summary judgment. 391 A2d at 199. In *Gizzi* the plaintiff's testimony that Texaco's advertising had instilled in him a sense of confidence in the corporation and its products created an issue of fact on reliance. 437 F2d at 310.

Defendant relies on *Wood* and *Little* to support its position. In *Wood*, there was no evidence that the plaintiff did business with the Shell dealer because he wished to do business with Shell Oil, a more responsible party. The court also relied on other cases that held that the use of an oil company's logos, uniforms, products, signs, and literature is insufficient in itself to create an inference of agency, because of its belief that it is common knowledge among the general public that independent dealers often use such identifying marks. Whatever the merits of the *Wood* court's view of common knowledge, that is properly a matter for argument to a

jury and is insufficient to support a holding that reliance is unreasonable as a matter of law.

In *Little*, there was no evidence that the plaintiff relied on the perceived fact that the franchisee was an agent of Howard Johnson's or that her belief that Howard Johnson operated the restaurant led her justifiably to expect that the sidewalk on which she fell would be free of ice and snow. The court ruled against her claim because mere conjecture did not meet her burden of coming forth with documentary evidence of a material issue of fact. 455 NW2d at 394.

In contrast to *Wood* and *Little*, in this case plaintiff testified that she relied on the general reputation of McDonald's in patronizing the Tigard restaurant and in her expectation of the quality of the food and service that she would receive. Especially in light of defendant's efforts to create a public perception of a common McDonald's system at all McDonald's restaurants, whoever operated them, a jury could find that plaintiff's reliance was objectively reasonable. The trial court erred in granting summary judgment on the apparent agency theory.

Reversed and remanded.