Gants, J.
On the evening of September 29, 1998, the plaintiff, Bacem Moussa, took the taxi ride from Hell. According to his complaint (which he later verified by affidavit), he entered a taxi parked in front of the Marriott Hotel in Kendall Square in Cambridge driven by the defendant Gamal Abdel-Kader (“Abdel-Kader”) and asked to be taken to Harvard Square. When Abdel-Kader headed towards Memorial Drive, Moussa asked him where he was going and told him to turn around and go via Broadway Street. Abdel-Kader told him that he knew the best way to Harvard Square and that the best way is via Memorial Drive. Abdel-Kader then returned to the entrance of the Marriott Hotel, and Moussa told him to stop because he did not want to ride with him any longer. Moussa had opened the passenger door and had one leg out of the taxi when Abdel-Kader asked him if he was going to pay the $1.80 fare on the meter. Moussa said he would not. Abdel-Kader, with Moussa’s leg still outside the door, then began to speed away and Moussa brought his leg back into the taxi and closed the door.
Moussa thought that Abdel-Kader was going to drive him to Harvard Square but that is not the direction he headed. When Moussa asked him where he was going, Abdel-Kader replied, “I’m going home.” Abdel-Kader refused Moussa’s plea to return him to the hotel and told him, “This will be the worst night of your life.” And it was. Abdel-Kader proceeded to drive through several traffic lights at high speed. Moussa opened the right-side passenger door, hoping to attract attention. Abdel-Kader verbally abused and threatened Moussa and told him to get out of the cab, but he would not stop the taxi to permit Moussa safely to do so. Moussa was continuing to hold the passenger door open when Abdel-Kader entered Interstate 1-93 at very high speed. Moussa eventually closed the door, despairing as to how he would ever escape this surreal ride. When Abdel-Kader eventually left 1-93, Moussa again opened the right passenger door and finally was able successfully to communicate to the driver of another vehicle that he was being kidnapped and that the police should be called. The good Samaritan driver of the other vehicle succeeded in forcing Abdel-Kader’s taxi to come to a complete stop and blocked its way, which allowed Moussa finally to escape from the cab.
Moussa’s amended complaint alleges seven counts:
1. assault;
2. false imprisonment;
3. intentional infliction of emotional distress;
4. negligent infliction of emotional distress;
5. negligent selection, retention, and supervision;
6. negligent entrustment; and
7. violation of G.L.c. 93A.
The first four counts are alleged against all defendants, while the last three are alleged against all defendants other than Abdel-Kader.
The defendant Cambridge Transportation Services, Inc. d/b/a Cambridge Checker Cab Co. (“Checker”) now moves for summary judgment on all counts. After hearing and for the reasons stated below, Checker’s motion for summary judgment is ALLOWED IN PART AND DENIED IN PART.
DISCUSSION
Common Carrier Liability
A cab company is held to the duty of care of a common carrier. Gilmore v. Acme Taxi Co., 349 Mass. *22 651, 652 (1965), Teixeira v. Cab Three, Inc., 1994 Mass.App.Div. 154, 1994 WL 413034 (1994). The duty of care of a common carrier, as a matter of public policy, is “the highest standard of care, approaching that of an insurer.” Teixeira, 1994 WL 413034 at 2. A common carrier is responsible not only for the negligence of its servants but also for their willful misconduct. Gilmore, 349 Mass, at 652; Teixeira, 1994 WL 413034 at 2. Moreover, a common carrier is responsible for the negligence and willful misconduct of independent contractors who perform the work of the carrier. Teixeira, 1994 WL 413034 at 3. In short, a common carrier has a “non-delegable duty ... to protect its passengers.” Teixeira, 1994 WL 413034 at 4.
The non-delegable obligations of a common carrier derive from the medallion issued by a city entitling its holder to operate a taxi for the transportation of passengers for hire within that city. Teixeira, 1994 WL 413034 at 2. See also Restatement (Second) of Torts, §428 (imposing liability for negligence of independent contractor on a corporation “carrying on an activity which can be lawfully carried on only under a franchise granted by public authority”).
Moussa contends that Checker should be deemed a common carrier and therefore liable for the willful misconduct of Abdel-Kader. Checker, however, did not own the taxi driven by Abdel-Kader; the defendant Miri Transportation, Inc. (“Miri”) owned the cab. Nor was Checker the grantee of the taxi medallion issued by the Cambridge Licensing Commission authorizing the operation of the cab within the City of Cambridge; Miri held the medallion. Nor did Checker own or control Miri, or have any financial interest in Miri.
Checker’s only relationship to Miri and to the cab driven by Abdel-Kader was through a contract executed between Checker and Miri on April 24, 1997 entitled, “Radio Subscription Agreement” (“Agreement”). Under this Agreement, Checker agreed to provide taxi radio dispatch service to Miri and to assume responsibility for billing, accounting, and collecting all authorized charges from customers authorized by Checker. In return, Miri agreed to pay Checker $55 per week for radio dispatch service and ten percent of all gross charge amounts. As part of this Agreement, Miri agreed to use the Checker colors and insignia, to operate its taxi in compliance with all applicable laws, to maintain its taxi in a sound and safe mechanical condition and to keep it clean, and to require its drivers to attend and successfully complete a Checker Radio Orientation Class. The Agreement further provides:
Subscriber [Miri] acknowledges, agrees and understands that it has no authority to bind or obligate Checker in any way whatsoever. Both parties agree and understand that each is free from the direction, authority or control of the other. Subscriber understands that it is under no duty to accept or perform radio dispatched calls and is entirely free, in its own discretion, to accept or not accept the same. Subscriber agrees, understands and acknowledges that in no way is it to be considered an employee, agent or servant of Checker Communication, Inc., but is in fact an independent entity which has purchased taxi radio service for an established fee.
Agreement at ¶ 13.
Moussa attempts to characterize Checker as the apex of a taxi hierarchy, with the medallion owners, including Miri, providing service as Checker cabs. This is admittedly what the world of taxis may look like to a taxi customer, as he gazes at a line of Checker cabs waiting at a cab stand, but it does not reflect the actual contractual arrangement between Checker and Miri. Checker simply provided dispatch and billing services to Miri, for which it received $55 per week plus a ten percent commission on all gross charges. It did not receive any share of Miri’s profits, nor did it have any control over Miri’s operations. In short, Checker was an independent contractor of Miri, not vice-versa. Therefore, while Miri potentially may be liable under the non-delegable duty of care of a common carrier for misconduct committed by its dispatcher, even though it delegated its dispatch function to an independent contractor (Checker), Checker does not also become a common carrier simply because it performed these delegated duties.
Nor is the result any different because Checker imposed on Miri through their Agreement certain obligations to use the Checker colors and insignia, to operate its taxi in compliance with all applicable laws, to maintain its taxi in a sound and safe mechanical condition and to keep it clean, and to require all its drivers to attend and successfully complete a Checker Radio Orientation Class. Checker did not become a common carrier simply because it imposed some requirements on those taxis which carry the Checker name and to which it directed its customers. In short, Checker cannot be a common carrier unless it owned the taxi or held the medallion, or owned or controlled the company that owned the taxi or held the medallion. See Teixeira, 1994 WL 413034 at 2.
Not only does Moussa’s argument — that Checker’s performance of these duties as an independent contractor transforms it into a common carrier — find no support in the law, but such a ruling would also be contrary to public policy and good sense. The cab company that owns the cab and holds the medallion controls the cab. It is not unfair to require that company, if it delegates control of the cab to another, to ensure that the cab remains in good hands and to require the cab company to pay any liability if it delegates unwisely. As a matter of policy, imposing vicarious liability is likely to help focus the cab company’s attention on issues of safety. An independent contractor handling dispatch and billing, in contrast, does not control the cab or select who shall *23 control the cab. Since it cannot ensure that the cab remains in good hands, it would be unfair to hold it liable for the consequences of someone else’s poor judgment. As a matter of policy, imposing vicarious liability, on the independent contractor will not improve safety because the contractor is powerless to take the steps associated with safety. Indeed, if Checker became a common carrier by assuming these dispatch and billing obligations and thereby became liable for everything that happens with that taxicab, its insurance premium would increase so much that no one would agree to perform such duties except at a prohibitively high price. Cab companies would either have to perform these specialized tasks in-house or pay much more for these services.
Since Checker is not a common carrier, it is not vicariously liable as a common carrier for the willful misconduct or negligence of Abdel-Kader. To the extent that Moussa’s claims depend on common carrier liability, summary judgment must be allowed.
Actual and Apparent Agency
■ While the contractual obligations imposed on Miri by Checker through their Agreement do not transform Checker into a common carrier, it is a separate issue whether Checker may still be vicariously liable for Abdel-Kader’s misconduct through actual or apparent agency.
One corporation may be vicariously liable for the misconduct or negligence of another through actual agency if the former corporation has a right not only to set standards but also to control the daily operations of the latter corporation. Miller v. McDonald’s Corp., 945 P.2d 1107, 1110-11 (Ct.App.Or. 1997); Billops v. Magness Construction Co., 391 A.2d 196, 197-98 (Supreme Ct. Del. 1978); Gizzi v. Texaco, Inc., 437 F.2d 308 (3rd Cir. 1970). In Miller, the plaintiff bit into a sapphire stone while eating a Big Mac sandwich she had purchased at a McDonald’s restaurant owned by 3K Restaurants, which held a franchise from the defendant McDonald’s Corporation. 945 P.2d at 1108. The Oregon Court of Appeals held that McDonald’s could be vicariously liable for the negligence of its franchisee because the franchise agreement did more than set standards that 3K had to meet. Id. at 1111. “Rather, it required 2K to use the precise methods that [McDonald’s] established, both in the Agreement and in the detailed manuals that the Agreement incorporated.” Id. The Agreement between Miri and Checker did nothing more than set standards for Miri to meet; it was silent as to how Miri was to meet them. For instance, it obligated Miri to operate its taxi cab in compliance with all applicable laws, to maintain its taxi cab “in a good and safe mechanical condition,” and to “ensure that the taxi cab is kept in a clean and presentable condition inside and out.” It did not provide any guidance as to the methods that Miri must use to satisfy these standards. Therefore, even viewing the evidence in the light most favorable to Moussa (as I must on summary judgment), there is no evidence that Miri was Checker’s actual agent.
Even in the absence of actual agency, a corporation may be vicariously liable for the tortuous conduct of another corporation that was its apparent agent. Chase v. Independent Practice Association, Inc., 31 Mass.App.Ct. 661, 667 (1991); Miller v. McDonald’s Corp., 945 P.2d at 1111-14; Billops v. Magness Construction Co., 391 A.2d at 198-99; Gizzi v. Texaco, Inc., 437 F.2d at 309-11. Section 267 of the Restatement (Second) of Agency provides:
One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such.
Restatement (Second) of Agency, §267. See also Restatement (Second) of Agency, §265(2) (principal liable in tort for conduct of apparent agent if there has been reliance). The first illustration in the Reporter’s Notes for Section 267 is analogous to the case at bar and descriptive of this principle:
P, a taxicab company, purporting to be the master of the drivers of the cabs, in fact enters into an arrangement with the drivers by which the drivers operate independently. A driver negligently injures T, a passenger, and also B, a person upon the street. P is not liable to B. If it is found that T relied upon P as one furnishing safe drivers, P is subject to liability to T in an action of tort.
Restatement (Second) of Agency §267, Reporter’s Notes, Comment a, Illustration 1.
As reflected in the Restatement of Agency, to establish apparent agency in this case, Moussa must prove more than that he reasonably believed he was entering a cab owned or controlled by Checker. Restatement (Second) of Agency §267, Reporter’s Notes, Comment a. He must also show that his belief was caused by the manifestations of Checker, either made directly or through trademarks, signs, or advertising. See Miller v. McDonald’s Corp., 945 P.2d at 1113; Billops v. Magness Construction Co., 391 A.2d at 198; Gizzi v. Texaco, Inc., 437 F.2d at 309. Most importantly, he must establish that he relied in his conduct on the belief that the cab he was entering was owned or controlled by Checker and his reliance must have been reasonable under the circumstances. See Miller v. McDonald’s Corp., 945 P.2d at 1113; Billops v. Magness Construction Co., 391 A.2d at 198; Gizzi v. Texaco, Inc., 437 F.2d at 309.
There is sufficient evidence in the record to create a genuine issue of material fact as to the existence of apparent agency. Checker chose as part of its Agreement to require Miri to place Checker decals on its taxi and to paint its taxi using the Checker colors and *24 insignia. By transforming Miri’s cab visually into a Checker cab, Checker must have recognized that prospective customers might believe that Checker owned or controlled the cab. Indeed, it maybe inferred that the requirements imposed in the Agreement that the taxi be kept clean and mechanically sound were intended by Checker, at least in part, to protect the quality associated with its trademark. There is also evidence that Moussa indeed believed that he was entering a Checker Cab. In an answer to an interrogatory, Moussa affirmed under oath:
The logo on the taxicab driven by defendant Gamal Abdel-Kader . . . during the events described in the complaint announced that the taxicab was a Cambridge Checker Cab. Moussa chose to hire this particular taxicab only because he recognized the logo and believed that the cab was from a reputable company.
Answer to Interrogatory No. 1, Plaintiffs Responses to Defendant Cambridge Checker Cab Company’s First Set of Interrogatories. The taxi that Abdel-Kader drove on the evening of September 29, 1998, in fact, was painted with the distinctive yellow of Checker Cabs and, on the front passenger door, read: “Checker Cab Co., O/O Miri Trans Inc” (sic). While Checker declares that “O/O” meant owned and operated by Miri, a factfinder may find that it was reasonable for a person in Moussa’s position to fail to recognize this.
Since, viewing the evidence in the light most favorable to Moussa, there is a genuine issue of material fact as to whether Miri was Checker’s apparent agent for purposes of determining vicarious liability for tortuous conduct, Checker’s motion for summary judgment must be denied to the extent that its alleged liability rests on this theory.[1]
Allowing an apparent agency theory of vicarious liability to go forward is not inconsistent as a matter either of law or policy with this Court’s rejection of the common carrier theory. To provide dispatch and billing services as an independent contractor, Checker did not need to require Miri to paint its cab yellow and use its logo. If all Checker did was provide those services, it would be out of the case. However, by requiring Miri’s cabs to look to the world like Checker Cabs, Checker assumed the risk of liability through apparent agency when customers act in reliance on the mistaken belief that Checker owns or controls the cabs that bear its colors and logo.
Checker’s Liability for Its Own Conduct
Moussa also contends that Checker should be found liable for negligent selection, retention, and supervision, negligent entrustment, and violation of G.L.c. 93A based on its own conduct in failing to prevent Abdel-Kader from being hired by Miri and in allowing him to remain as a cabdriver. Viewed in the light most favorable to Moussa, there is evidence that Checker had admitted through its designated spokesman that it had fired Abdel-Kader several months before September 29, 1998 because of his “sharp” and “surly” behavior, that Abdel-Kader “would go off the deep end in a heartbeat,” and that he “totaled” a cab when he worked for Checker.[2] It is undisputed that Checker did not communicate to Miri this information or even know that Miri had hired Abdel-Kader. Finally, it is also undisputed that Checker did not keep any record of complaints regarding the conduct of cabdrivers it dispatched but simply referred those complaining to the appropriate governmental authorities.[3]
In order to find Checker liable for its own allegedly negligent conduct, Checker must owe the plaintiff a duty of care. See Spinner v. Nutt, 417 Mass. 549, 552 (1994). Moussa has provided no legal support for the unusual proposition that, having fired Abdel-Kader, Checker had a duty either to ensure that Abdel-Kader was not hired by any of its subscribers or to communicate to its subscribers what it knew of Abdel-Kader. Nor is there any provision in the Agreement between Miri and Checker that remotely imposes such a duty on Checker. As discussed earlier, Checker imposed standards on Miri as part of their Agreement, but the Agreement specifically provides that each party “is free from the direction, authority or control of the other.” Agreement at ¶13. Nor did Checker dispatch Abdel-Kader to pick up Moussa; Moussa hailed the cab himself, without any telephone call. Since Checker properly had no role in Miri’s hiring decisions, it cannot be found to have been negligent for failing to play such a role. Similarly, since it had no obligation to monitor complaints against Miri’s taxi drivers, it cannot be found to have been negligent for failing to have done so. And since it did not dispatch Abdel-Kader to pick up Moussa, it cannot be found negligent for doing so.
Therefore, Checker’s motion for summaryjudgment must be allowed as to Count 5 (negligent selection, retention, and supervision), Count 6 (negligent entrustment), and Count 7 (violation of G.L.c. 93A).
ORDER
For the reasons stated above, Checker’s motion for summaryjudgment is DENIED as to Counts 1, 2, 3, and 4 to the extent that Checker’s alleged liability rests on the theory of vicarious liability through apparent agency. Apart from that limited ground, Checker’s motion for summaryjudgment is ALLOWED as to all counts.

This Court expressly does not decide whether, if apparent agency is found, the scope of vicarious liability of Checker is limited to the conduct of its apparent agent that is actuated to some degree by an intent to perform the services for which he is apparently engaged or extends to the full scope of common carrier liability. See Restatement (Second) of Agency §267, Reporter’s Notes, Comment b. That subject was not briefed and the answer is not obvious.

Checker contends that it never employed or fired Abdel-Kader.

There is no evidence of any complaint received regarding Abdel-Kader.