Argued and submitted February 11, affirmed September 2, 2009

Alfred P. VIADO
and Pamela Viado,
*Plaintiffs-Appellants,*

*v.*

DOMINO'S PIZZA, LLC,
a Michigan limited liability corporation,
*Defendant-Respondent,*

*and*

ZZEEKS PIZZA & WINGZ, INC.,
an Oregon corporation,
dba Domino's Pizza No. 7231;
Scott L. Mathias;
and Does I - X,
*Defendants.*

Multnomah County Circuit Court
060504975; A136842

217 P3d 199

Eric S. Postma argued the cause and filed the briefs for appellants.

Jay W. Beattie argued the cause for respondent. With him on the brief were Glen P. McClendon and Kennedy K. Luvai, and Lindsay, Hart, Neil & Weigler, LLP.

Before Edmonds, Presiding Judge, and Wollheim, Judge, and Sercombe, Judge.

WOLLHEIM, J.

**WOLLHEIM, J.**

In 2005, plaintiff was injured when his motorcycle collided with a vehicle driven by Mathias, a pizza delivery driver.[1] At the time of the accident, Mathias was employed by and was delivering pizzas for Zzeeks Pizza & Wings, Inc. (Zzeeks), doing business as one of approximately 4,500 franchises of Domino's Pizza, LLC (Domino's). Plaintiff subsequently filed this negligence action against Mathias, Zzeeks, and Domino's. Domino's, in turn, moved for summary judgment on the ground that the facts were insufficient to establish its vicarious liability for the acts of its franchisee's employee. The trial court agreed, granted the motion, and entered a limited judgment in favor of Domino's. Plaintiff appeals that limited judgment, and we affirm.

■ For purposes of this appeal, the question is not whether Mathias was negligent; Domino's assumes that he was. The issue, rather, is whether plaintiff's evidence at the summary judgment stage would permit a reasonable juror to find Domino's vicariously liable for that negligence. ORCP 47 C. To better frame that issue, and to provide context for the pertinent facts in the summary judgment record, we begin with a general discussion of the principles of vicarious liability, as recently described in *Vaughn v. First Transit, Inc.*, 346 Or 128, 206 P3d 181 (2009). The first question, for purposes of vicarious liability, is whether the relationship in question is one of "agency":

> "At common law, 'agency' was defined as a relationship that 'results from the manifestation of consent by one person to another that the other shall act *on behalf and subject to his control*, and consent by the other so to act.' *Hampton Tree Farms, Inc. v. Jewett*, 320 Or 599, 617, 892 P2d 683 (1995) (emphasis added; internal quotation marks omitted). The 'agent' is the person in that relationship who acts on behalf of the other, the 'principal.' *Restatement (Second) of Agency* § 1 (1958).
>
> "* * * * *

---

[1] Plaintiff's wife also asserted claims in this action, but those claims do not present separate issues. For that reason, we do not discuss them separately.

"Even the ability to control in detail another's actions does not alone create an agency relationship; to qualify as an agent, one must also agree to act 'on [another's] behalf.' Thus, for example, a subordinate employee is not the agent of a supervisor simply because the supervisor has full control over the employee's work activities. Instead, both the subordinate and the supervisor are agents of their common employer, on whose behalf they have agreed to work. *See Restatement (Third) of Agency* § 1.01 comment g (giving examples). In sum, to be an 'agent'—using the well-defined legal meaning of that term—two requirements must be met: (1) the individual must be subject to another's control; and (2) the individual must 'act on behalf of' the other person."

*Vaughn*, 346 Or at 135-36.

■ In *Miller v. McDonald's Corp.*, 150 Or App 274, 945 P2d 1107 (1997), we considered how general agency principles applied in the context of a franchise relationship. We ultimately endorsed the reasoning set forth in *Billops v. Magness Const. Co.*, 391 A2d 196 (Del 1978):

"If, in practical effect, the franchise agreement goes beyond the stage of setting standards, and allocates to the franchisor the right to exercise control over the daily operations of the franchise, an agency relationship exists. 391 A2d at 197-98."

*Miller*, 150 Or App at 280. Thus, to determine whether the franchisee (and its employees[2]) are the agents of the franchisor, we look to whether the franchisor controls the day-to-day operations of the franchisee.

■ If the relationship at issue is one of agency, the next question, for vicarious liability purposes, is what *type* of agency. Again, the Supreme Court's discussion in *Vaughn* is instructive:

"Understanding agency law in the context of vicarious liability requires an understanding of two types of agents: employees (or 'servant' agents) and agents who are not employees (sometimes referred to as 'nonservant' agents).

---

[2] If Zzeeks is an agent of Domino's, then Mathias, an employee of Zzeeks, is also an agent of Domino's. *See Vaughn*, 346 Or at 134 n 5 (explaining that the relationships between a subagent and the appointing agent's principal are agency relationships).

'All servants are agents and all masters, principals. However, all principals and agents are not also masters and servants.' *Kowaleski v. Kowaleski*, 235 Or 454, 457, 385 P2d 611 (1963). The common law distinguishes between the two types of agents using a 'right-to-control' test. An agent is an employee if the principal has the right to control the physical details of the work being performed by the agent; in other words, the principal directs not only the end result, but also controls *how* the employee performs the work. *Schaff v. Ray's Land & Sea Food Co., Inc.*, 334 Or 94, 100, 45 P3d 936 (2002). In contrast, when the agent retains control over the details of the manner in which it performs its duties, that agent is a nonemployee agent. *Restatement (Second) of Agency* § 220 comment e.

"Distinguishing between employees and agents who are not employees is important for vicarious liability purposes, because a principal's liability for the torts of its agents varies based upon the type of agent. In general, a principal is liable for all torts committed by its employees while acting within the scope of their employment. *Minnis* [*v. Oregon Mutual Ins. Co.*, 334 Or 191, 201, 48 P3d 137 (2002)]. But a principal ordinarily is *not* liable in tort for physical injuries caused by the actions of its agents who are not employees. *Jensen v. Medley*, 336 Or 222, 230, 82 P3d 149 (2003). Rather, a principal is vicariously liable for an act of its nonemployee agent only if the principal 'intended' or 'authorized the result [ ]or the manner of performance' of that act. *Restatement (Second) of Agency* § 250; *see also Jensen*, 336 Or at 231 (principal liable for acts of nonservant agents only if those acts 'within the actual or apparent authorization of the principal'). In other words, for a principal to be vicariously liable for the negligence of its nonemployee agents, there ordinarily must be a connection between the principal's 'right to control' the agent's actions and the specific conduct giving rise to the tort claim."

346 Or at 137-38 (footnotes omitted; emphasis in original).

In light of those standards, we turn to the evidence in the summary judgment record, which we evaluate in the light most favorable to plaintiff, the nonmoving party. *Vaughn*, 346 Or at 132. Domino's franchises, including Zzeeks, are delivery-oriented businesses, the hallmark of which is timely delivery. Domino's goal is that its franchises will deliver pizzas within 30 minutes from the time that an

order is received. The scope of Zzeeks's delivery service is set forth in Domino's "Standard Franchise Agreement," which Zzeeks and Domino's executed in July 2002. That agreement grants Zzeeks an exclusive delivery area in which to operate and "offer delivery service to all customers" located within that area. "When making deliveries, [Zzeeks and its] employees must strictly comply with all laws, regulations, and rules of the road and due care and caution in the operation of delivery vehicles."

The franchise agreement also addresses "Operating Requirements" for Zzeeks. Under that section of the agreement, Zzeeks agrees to "comply with all specifications, standards and operating procedures and rules * * * relating to * * * (d) methods and procedures relating to receiving, preparing and delivering customer orders." In that regard, the agreement also incorporates certain "standards and operating procedures" set forth in a "Manager's Reference Guide," a document that addresses various aspects of franchise operation in exhausting detail.[3]

The "Standards" section of the Manager's Reference Guide provides a number of detailed requirements pertaining specifically to delivery drivers. Those requirements include:

"B.    Driver Safety

"1.    No keys are to be left in an unoccupied vehicle.

"2.    Age limit for Hiring

"No one under the age of eighteen (18) years shall be permitted to operate a motor vehicle while in the course and scope of employment at any Domino's Pizza location.

---

[3] Paragraph 15.4 of the agreement provides that "[t]he provisions of the Operating Manual as modified from time to time and the mandatory specifications, standards and operating procedures and rules prescribed from time to time by [Domino's] and communicated to [Zzeeks] in writing, will constitute provisions of this Agreement as if contained in this Agreement." The evidence in the summary judgment record indicates that the standards and operating procedures described in that paragraph are found in the "Standards" section of the Manager's Reference Guide, which Domino's provided to Zzeeks. Different parts of the Manager's Reference Guide were adopted at different times, as indicated in the guide, but all relevant portions were in effect before the accident in this case. When quoting portions of the guide, we have omitted any references to the date of enactment.

"3.    MVR Standard[.]"

The MVR standards are "Motor Vehicle Record" requirements that must be satisfied by Domino's Pizza delivery drivers. Subparagraphs a. through c. of the "MVR Standard" paragraph provide that all personnel must have their driving records (maintained by a governmental authority) verified "at the start of employment and at a minimum of every six months thereafter"; state that "[f]ranchisees who do not meet MVR requirements will not deliver pizza and other related products"; indicate that copies of "MVRs will be maintained in the Team Member's personnel file"; and set forth minimum driving history requirements—two years for drivers who are 18 years old and one year for drivers who are 19 or older.

The MVR standards continue:

"d.    No one will be allowed to drive a personal vehicle for Domino's Pizza without proof of insurance and a valid state driver's license.

"e.    Any Team Member involved in product delivery that does not comply with this Standard may only work for Domino's Pizza in a non-driving capacity and then only after signing a 'Non-Driving Agreement.'

"f.    No one will be allowed to drive for Domino's Pizza with a 'suspended,' 'provisional,' 'court restricted,' 'revoked,' 'learners permit' or 'junior' license. In the event of a 'probationary' license, a Team Member will be allowed to drive if the history requirement is fulfilled. Additional endorsements are acceptable.

"g.    No vehicle will be allowed to be used for business purposes for Domino's Pizza unless the vehicle passes a periodic inspection.

"h.    No team Member may operate a motor vehicle in the furtherance of the company's business unless that person possesses a valid state driver's license."

The next subparagraph under "MVR Standard" provides specific criteria that must be met by each driver. For example, a driver cannot have "more than two (2) violations in the past two (2) years (*e.g.*: speeding, failure to yield, fail to obey traffic signal/device, fail to stop, improper turn,

improper lane change, careless driving, follow too close, operated not restrained by safety belt)." Certain offenses automatically disqualify delivery drivers for three years from the date of the violation, such as leaving the scene of an accident, reckless driving, hit and run, and vehicular homicide.

Paragraph 4 of the "Driver Safety" subsection of the Manager's Reference Guide concerns the use of seat belts:

"a.   When driving or riding in a vehicle on the clock for Domino's Pizza, personnel are required to wear seat belts at all times.

"b.   No Team Member can be transported in an area of a vehicle where seat belts are NOT available, i.e. truck bed."

Paragraph 5 of that subsection provides that "[r]adar detectors are not permitted in any vehicle used while in the scope of employment for Domino's Pizza." Paragraph 6, the final paragraph of the "Driver Safety" subsection, is titled "Periodic vehicle inspection." It provides that "[a]ll delivery vehicles whether company or personal, used for delivery, must be inspected prior to hire and on a periodic basis," and specifically lists what the inspection must cover, including, among other things, headlights, taillights, windshield wipers, backup lights, horn, brake pressure, and the exhaust system. "Any vehicle, which does not pass the inspection, is not to be used during the course and scope of employment." Moreover, "[i]nsurance is to be valid and current at all times and must be inspected prior to hire and a minimum of twice a year."

Subsection C. of the Manager's Reference Guide addresses "Mobile Phone Use." Although that subsection is separate from Driver Safety, it indirectly addresses the safe operation of delivery vehicles:

"1.   No Team member during work hours for Domino's Pizza shall drive a vehicle while using a mobile telephone. The only exception is a 'hands-free mobile telephone' which permits the team member to talk and listen without the use of either hand.

"2.   A team member may use a hands-free mobile phone while the vehicle is in motion to activate, deactivate

or initiate a one touch call and if the team member uses the highest degree of care while doing so. In all other circumstances the team member must pull over at a legal, safe location to place the call.

"3.   All mobile phones must be turned off while at a gas station. If the phone is turned on, a static electric charge could occur, which could ignite the gas fumes and cause a fire."

In addition to the above-described requirements regarding driving safety, the "Standards" also provide that "safe driving lessons in Book One must be successfully completed by every Team Member who delivers pizzas." The Book One standards cover subjects such as defensive driving techniques, rights of way at intersections, planning routes, etc. The delivery driver in this case, Mathias, had watched a Domino's training video before starting his employment with Zzeeks.

Under the franchise agreement, Domino's also retains the right to conduct inspections of Zzeeks's operations and business records. To the extent that Domino's discovers violations of its standards and operating procedures, it has the right to terminate the franchise agreement if those violations are not cured within seven days after Zzeeks receives notice. Moreover, "[i]n the event that the conditions [at Zzeeks] or operations at [Zzeeks], in [Domino's] judgment, present a threat of imminent danger to public health or safety, [Domino's] may require the immediate cessation of operations at the Store upon delivery of a Notice of Immediate Cessation of Operations and Termination (the 'Notice') to [Zzeeks]."[4]

Despite the detailed operating procedures that must be followed by Zzeeks, the franchise agreement nevertheless states that "the parties to this Agreement are independent contractors" and that "the relationship created by this Agreement and the relationship between us is not a fiduciary relationship nor one of principal and agent." Under the terms of the agreement, Domino's has "no relationship

_____

[4] In the event that Zzeeks were to receive such a notice, the franchise agreement contemplates that the parties would meet within 24 hours to develop a plan to correct the deficiencies within seven days of delivery of the notice.

with [Zzeeks's] employees and ha[s] no rights, duties, or responsibilities with regard to their employment by [Zzeeks]." The agreement further states that Zzeeks "shall be solely responsible for recruiting, hiring, training, scheduling for work, supervising and paying the persons who work in the Store and those persons shall be your employees, and not our agents or employees."[5]

With those facts in mind, we turn to the relevant question on appeal: whether, on the record before us, a reasonable juror could find Domino's vicariously liable for the negligent driving of its franchisee's employee. As explained above, that question involves three subparts: (1) Is the relationship between Domino's and Zzeeks one of agency? (2) If so, what type of agency relationship does Domino's have with Zzeeks—*i.e.*, an employee or nonemployee relationship? And (3) If Zzeeks is a nonemployee agent, did plaintiff come forward with sufficient evidence of a "connection between [Domino's] 'right to control' [Zzeeks's] actions and the specific conduct giving rise to the tort claim." *Vaughn*, 346 Or at 138.

We begin our analysis with the first of those three inquiries: Whether the summary judgment record, viewed in the light most favorable to plaintiff, demonstrates that Zzeeks was Domino's' agent under the common law. As explained above, to be an "agent" for purposes of imposing vicarious liability, "two requirements must be met: (1) the individual must be subject to another's control; and (2) the individual must 'act on behalf of' the other person." *Vaughn*, 346 Or at 136.

In this case, Domino's has not put in issue the second of those requirements—*i.e.*, that Zzeeks was acting "on behalf of" Domino's. Rather, the thrust of Domino's argument below and on appeal is that, on this summary judgment record, no reasonable juror could find that Zzeeks was subject to the control of Domino's. In short, our case law says otherwise.

---

[5] Another section of the franchise agreement states that Zzeeks "acknowledge[s] and understand[s] that it is not [Domino's] responsibility or duty to operate the Store and [Domino's] do[es] not have the legal right to direct [Zzeeks's] employees in the operation of the Store. Those functions remain [Zzeeks's] sole responsibility and duty."

In *Miller*, we set forth a test for determining whether a franchisor had a sufficient "right of control" over its franchisee such that the franchisee was its agent. We explained:

> "The kind of actual agency relationship that would make [the franchisor] vicariously liable for [the franchisee's] negligence requires that [the franchisor] have the right to control the *method* by which [the franchisee] performed its obligations under the Agreement. The common context for that test is a normal master-servant (or employer-employee) relationship. *See, e.g., Jenkins v. AAA Heating*, 245 Or 382, 386, 421 P2d 971 (1966); *Chard v. Beauty-N-Beast Salon*, 148 Or App 623, 628, 941 P2d 611 (1997). The relationship between two business entities is not precisely an employment relationship, but the Oregon Supreme Court, in common with most if not all other courts that have considered the issue, has applied the right to control test for vicarious liability in that context as well. *See Peeples v. Kawasaki Heavy Indust., Ltd.*, 288 Or 143, 603 P2d 765 (1979). We therefore apply that test to this case."

*Miller*, 150 Or App at 279 (emphasis in original). We noted that the Supreme Court in *Peeples* had held that, where "the record as a whole supported a finding that the distributor had the right to control the dealer's conduct in providing warranty service * * *[,] the trial court properly submitted the issue of the distributor's vicarious liability [for negligent service work] to the jury." 150 Or App at 279. We then observed that other courts had applied the "right-to-control" test in the franchise context:

> "A number of other courts have applied the right to control test to a franchise relationship. The Delaware Supreme Court, in *Billops v. Magness Const. Co.*, 391 A2d 196 (Del 1978), stated the test as it applies to that context:
>
> > " 'If, in practical effect, the franchise agreement goes beyond the stage of setting standards, and allocates to the franchisor the right to exercise control over the daily operations of the franchise, an agency relationship exists.' 391 A2d at 197-98.
>
> "This statement expresses the general direction that courts have taken and is consistent with the Supreme Court's discussion in *Peeples*. We therefore adopt it for the purposes of this case."

*Miller*, 150 Or App at 279-80.

We then compared the Delaware court's decision in *Billops* to an Alabama case, *Wood v. Shell Oil Co.*, 495 So 2d 1034 (Ala 1986), in an effort to discern "when a franchisor has retained a right not only to set standards but also to control the daily operations of the franchisee." 150 Or App at 280. After comparing the facts of those cases, we distilled the following principle:

> "The essential distinction between *Wood* and *Billops* is the extent to which the franchisor retained control over the details of the franchisee's performance. In *Wood*, the franchisor required only that mechanical work be done in a workmanlike manner. In *Billops*, however, the franchisor issued a manual that described the methods by which the franchisee was to carry out its responsibilities in considerable detail. The agreement in *Wood*, thus, could only be read as providing standards that the franchisee had to meet, while the agreement in *Billops* could be read as retaining the right to exercise control over the franchisee's daily operations."

150 Or App at 281.

We next examined the franchise relationship in *Miller* in light of that principle:

> "The facts of this case are close to those in *Billops*. For that reason, we believe that a jury could find that [the franchisor] retained sufficient control over [its franchisee's] daily operations that an actual agency relationship existed. The Agreement did not simply set standards that [the franchisee] had to meet. Rather, it required [the franchisor] to use the precise methods that defendant established, both in the Agreement and in the detailed manuals that the Agreement incorporated. Those methods included the ways in which [the franchisee] was to handle and prepare food. [The franchisor] enforced the use of those methods by regularly sending inspectors and by its retained power to cancel the Agreement. That evidence would support a finding that [the franchisor] had the right to control the way in which [the franchisee] performed at least food handling and preparation. In her complaint, plaintiff alleges that [the franchisee's] deficiencies in those functions resulted in the sapphire being in the Big Mac and thereby caused her injuries. Thus, as in *Peeples*, there is evidence that [the

franchisor] had the right to control [the franchisee] in the precise part of its business that allegedly resulted in plaintiff's injuries. That is sufficient to raise an issue of actual agency."

150 Or App at 281.

Turning back to the facts in this record, there is evidence that the franchise relationship between Domino's and Zzeeks includes at least as much control over the day-to-day operations of the franchise as in *Miller*. The franchise agreement and Domino's' operating manual together set forth detailed rules and operating procedures relating to:

"(a)   the safety, maintenance, cleanliness, sanitation, function and appearance of the Store premises and its equipment, image, fixtures, furniture, decor and signs.

"(b)   qualifications, dress, grooming, general appearance and demeanor of [Zzeeks and its employees,]

"(c)   quality, taste, portion control and uniformity, and manner of preparation and sale, of all pizza and other authorized food and beverage products sold by the Store and of all ingredients, supplies and materials used in the preparation, packaging and sale of these items,

"(d)   methods and procedures relating to receiving, preparing and delivering customer orders,

"(e)   the hours during which the Store will be open for business,

"(f)   use and illumination of exterior and interior signs, posters, displays, menu boards and similar items,

"(g)   the handling of customer complaints,

"(h)   advertising on the Internet or other electronic media, including websites, home pages and the use of domain names,

"(i)   e-mail capabilities of the Store and other electronic communication devices to facilitate communication with us or our offices, and,

"(j)   the method and manner of payment which will be accepted from customers."

Under the franchise agreement, Domino's retained the ability to modify the operating procedures from time to time, and those modifications constituted part of the franchise agreement as though they had been set forth in that agreement. Domino's also retained "the right at any time during business hours and without prior notice to conduct reasonable inspections of the Store, its operations, and its business records[.]" In the event that Zzeeks failed to comply with "any specification, standard or operating procedure or rule prescribed by [Domino's] which relates to the use of any Mark, safety and security, or the quality of pizza or other authorized food products or any beverage sold by [Zzeeks,]" Domino's had the right to terminate the agreement, provided that Zzeeks did not cure the failure within seven days after delivery of the notice of the failure.[6]

On this record, a reasonable juror could conclude that the rules and operating procedures went beyond the stage of setting standards, and that Domino's retained sufficient control over certain day-to-day operations of Zzeeks, its franchisee, to establish an agency relationship.[7] *See Vaughn*, 346 Or at 136 ("control" includes the "right to give interim instructions or directions to the agent once their relationship is established") (quoting *Restatement (Third) of Agency* § 1.01 comment f (2006)).

In light of our conclusion that Domino's exercised sufficient control over Zzeeks to establish an agency relationship, the next question is what *type* of agency relationship,

---

[6] Although the nature of Domino's franchise agreements has undoubtedly changed over the years, the Florida court's observation in *Parker v. Domino's Pizza, Inc.*, 629 So 2d 1026, 1029 (Fla App 1993), *rev den*, 639 So 2d 977 (1994), remains apt:

"The manual which Domino's provides to its franchisees is a veritable bible for overseeing a Domino's operation. It contains prescriptions for every conceivable facet of the business: from the elements of preparing the perfect pizza to maintaining accurate books; from advertising and promotional ideas to routing and delivery guidelines; from order-taking instructions to oven-tending rules; from organization to sanitation. The manual even offers a wide array of techniques for 'boxing and cutting' the pizza, as well as tips on running the franchise to achieve an optimum profit. The manual literally leaves nothing to chance."

[7] The trial court, in its oral ruling, reached that conclusion as well: "I'm satisfied from the materials that I've seen that there's enough evidence of control of various aspects or areas of the business that you get past the first step in the analysis."

which in turn determines the concomitant standard for vicarious liability. According to Domino's, franchise relationships—to the extent that they are agency relationships at all—are treated as nonemployee agency relationships under Oregon law; hence, a franchisor is vicariously liable only where the franchisor controlled the specific instrumentality or method that caused the plaintiff's injury. *Cf. Miller*, 150 Or App at 281 (concluding that the plaintiff had created a genuine issue of material fact regarding vicarious liability where there was evidence that the franchisor "had the right to control [the franchisee] in the precise part of its business that allegedly resulted in plaintiff's injuries"). Plaintiff, meanwhile, contends that "*Miller* does not require courts to focus solely upon the control exercised by a franchisor over the specific instrumentality or method that caused the injury." Under plaintiff's reading of *Miller*, this court should apply a broader standard of vicarious liability akin to that applicable in the master-servant context.

Frankly, *Miller* is not entirely clear on the question whether the franchise relationship in that case was treated as an employee relationship or as a nonemployee agency relationship. Part of the confusion stems from the fact that the "right to control" is considered at various stages of the vicarious liability analysis: first, in determining whether an agency relationship exists at all (Is the purported agent subject to the principal's control?); second, in determining whether the agent is an employee or nonemployee agent (Does the purported principal have the right to control the physical details of the purported employee's work?); and third, in the case of a nonemployee agent, in determining whether the principal intended or authorized the result or manner of performance of the act (Did the principal have the right to control the physical details of the part of the business that injured the plaintiff?).

In *Miller*, we observed that "[t]he relationship between two business entities is not precisely an employment relationship," but that Oregon courts have applied the "right-to-control" test in that context as well. 150 Or App at 279. Although our discussion of the "right to control" test was consistent with a conclusion that the franchisee in *Miller* was an

employee agent, our analysis that followed suggested otherwise. In determining whether there existed a jury question on the issue of vicarious liability, we focused not on whether the tort was committed within the course of employment but rather on whether there was a connection between the principal's "right to control" and the specific conduct giving rise to the tort claim: "Thus, as in *Peeples*, there is evidence that [the franchisor] had the right to control [the franchisee] *in the precise part of its business that allegedly resulted in plaintiff's injuries.*" 150 Or App at 281 (emphasis added). That is the standard typically applicable to *nonemployee* agents.

In *Miller*, this court essentially skipped over the question whether the franchisee was an employee of the franchisor in that case.[8] In addressing that question here, however, we are mindful of the court's observation in *Miller* that "the relationship between two business entities is not precisely an employment relationship." 150 Or App at 279.

■ The test for determining whether an agent is an employee is predominantly driven by the "extent to which the purported employer has the right to control the performance of services by the individual." *Schaff*, 334 Or at 99-100. " '[T]here is no simple measure of the extent to which an employer may control a worker in the performance of his task without creating a master-servant relationship,' " but " 'control over performance remains the principal test.' " *Id.* at 100 (quoting *Jenkins v. AAA Heating & Cooling, Inc.*, 245 Or 382, 386-87, 421 P2d 971 (1966)) (emphasis omitted). Other factors may bear on the analysis as well, namely the *Restatement* factors:

> " '(1)  A servant is a person employed to perform services in the affairs of another and who with respect to the physical

---

[8] In *Peeples*, one of the cases on which *Miller* relied, the court did something similar. In *Peeples*, the Supreme Court held that a distributor could be vicariously liable for the dealer's negligent servicing of a motorcycle where the evidence demonstrated that the distributor had "the contractual right to control the manner in which the dealer performed warranty service on Kawasaki motorcycles." 288 Or at 149-50. Thus, the focus for vicarious liability purposes was on whether the dealer had the right to control the particular conduct that injured the plaintiff, even though the court described the relationship between the two businesses in employer-employee terms: "There was evidence from which the jury could find that the dealer, acting as the distributor's employee, routinely checked and, if necessary, adjusted the chain and sprocket assembly before delivering a new motorcycle to a customer." *Id.* at 150-51.

conduct in the performance of the services is subject to the other's control or right to control.

" '(2)   In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered:

" '(a)   the extent of control which, by the agreement, the master may exercise over the details of the work;

" '(b)   whether or not the one employed is engaged in a distinct occupation or business;

" '(c)   the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

" '(d)   the skill required in the particular occupation;

" '(e)   whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

" '(f)   the length of time for which the person is employed;

" '(g)   the method of payment, whether by the time or by the job;

" '(h)   whether or not the work is a part of the regular business of the employer;

" '(i)   whether or not the parties believe they are creating the relation of master and servant; and

" '(j)   whether the principal is or is not in business.' "

*Kowaleski*, 235 Or at 460-61 (quoting *Restatement (Second) of Agency* § 220).

In this case, Domino's set standards regarding many (if not most) of the daily operations of Zzeeks and retained the right to inspect Zzeeks and terminate the franchise relationship for violations of its standards. That control, however, must be viewed in the context of the particular relationship at issue. In the context of a franchise agreement, the franchisor always can be expected to establish certain standards for uniformity of operations; it is that uniformity—and the expectations that are associated with the franchisor's trade name—that make the franchise valuable. *See generally* Dean T. Fournaris, *The Inadvertent Employer: Legal and*

*Business Risks of Employment Determinations to Franchise Systems*, 27 SPG Franchise LJ 224 (2008). Apart from that type of exercise of control, the undisputed evidence establishes that Domino's *did not* retain the right to control Zzeeks in the way that an employer controls an employee. The franchise agreement itself provides that the parties to the agreement are independent contractors. It further provides that "it is not [Domino's'] responsibility or duty to operate the Store" and that Domino's "does not have the legal right to direct [Zzeeks's] employees in the operation of the Store." Although those terms in a franchise agreement are not dispositive of whether the franchisee is an independent contractor rather than an employee, they are evidence of an independent contractor relationship. *Schaff*, 334 Or at 104.

Other aspects of the franchise relationship are patently inconsistent with the traditional employer-employee relationship and, in our view, dispositive. Under the franchise agreement, Domino's does not compensate Zzeeks as its employee; rather, Zzeeks "agree[s] to pay [Domino's] a royalty fee of five and one-half percent (5-1/2%) of the weekly royalty sales of the Store" in exchange for the right to use Domino's' trademark and uniform business format. Zzeeks bears responsibility under the franchise agreement for site development and construction, has the ability to advertise and promote itself, and ultimately has the right to assign away its rights or otherwise transfer its ownership interest in the franchise. Given the complex nature of the franchise relationship between these two businesses, no reasonable juror could conclude on this record that Zzeeks was Domino's' "employee." And for that reason, we conclude as a matter of law that Zzeeks was, at most, a *nonemployee* agent of Domino's. *Cf. Schaff*, 334 Or at 103 (where "facts and any reasonable inferences that a jury could draw from those facts would not support a conclusion that the putative employer had the right to control the putative employee's work performance, then there is no triable issue of fact, and a defendant is entitled to have the issue decided as a matter of law"); *Wallowa Valley Stages, Inc. v. Oregonian Pub. Co.*, 235 Or 594, 600, 386 P2d 430 (1963) ("Whether or not a given person is the servant or the contractor of another is ordinarily a question of law, where the facts are clear.").

As the court explained in *Vaughn*, "a principal ordinarily is *not* liable in tort for physical injuries caused by the actions of its agents who are not employees." 346 Or at 137 (emphasis in original). "Rather, a principal is vicariously liable for an act of its nonemployee agent only if the principal 'intended' or 'authorized the result [ ] or the manner of performance' of that act." *Id.* (quoting *Restatement (Second) of Agency* § 250). Thus, "for a principal to be vicariously liable for the negligence of its nonemployee agents, there ordinarily must be a connection between the principal's 'right to control' the agent's actions and the specific conduct giving rise to the tort claim." 346 Or at 138.

*Vaughn*, like this case, involved a plaintiff who was injured as the result of allegedly negligent driving by a principal's nonemployee agent. The plaintiff in *Vaughn* was injured while riding on an airport shuttle bus, and she filed an action against the bus driver, Zavoral, and the shuttle bus company, First Transit, Inc. The defendants asserted that they were immune from liability as agents of the Port of Portland under the Oregon Tort Claims Act (OTCA), and the trial court and this court agreed. The Supreme Court, however, reversed on the ground that the Port would not have been vicariously liable for the defendants' negligence at common law and, thus, the defendants were not "agents" of the Port for purposes of the OTCA.

In determining whether the defendants shared the Port's immunity under the OTCA, the court framed the issue as follows:

"[F]or the Port to be vicariously liable under the OTCA for First Transit's (or Zavoral's) negligence—and for plaintiffs to be limited to bringing an action against the Port only—*defendants must be able to show that the Port had the right to control the physical details of the manner of performance of the conduct giving rise to the tort—Zavoral's driving.*"

346 Or at 141 (emphasis added). The court ultimately held that the defendants had not made that showing at the summary judgment stage:

"Defendants argue that [their] contract [with the Port] 'leaves First Transit with very little discretion over how to

[run the shuttle bus operation]' and point to several provisions in the contract that give the Port control over various aspects of the shuttle bus business. *Plaintiff responds that the contract does not demonstrate that the Port maintained the right to control the physical details of the conduct giving rise to the claim, namely, the driving of First Transit's employees. See Jensen,* 336 Or at 231, 236-38 (discussing principal's liability for actions of nonservant agents and focusing on specific allegedly wrongful conduct).

"We agree with plaintiff. Although the Port retained the right to reject unilaterally any of First Transit's employees, including its operations manager, that provision is not equivalent to one expressly retaining the right to control the day-to-day performance of those employees. The contractual provision instead appears to be a way for the Port to protect its interests if First Transit hires (or, more likely, fails to fire) an employee whom the Port thinks is particularly incompetent. We recognize that the contract does provide other limits on First Transit's hiring; for example, First Transit was obligated to ensure that all its drivers were properly licensed. However, those general hiring standards do not serve to grant control to the Port over the day-to-day performance of First Transit's employees. The performance standards, as they relate to the drivers, are general requirements that First Transit 'provide high quality customer service' and assure 'the neat appearance, courtesy, efficiency, and conduct' of its employees. *For the Port to be vicariously liable for the negligent driving of First Transit's employees, the Port would have to have the same right to control that driving as it would have over the driving of its own employees.*"

346 Or at 141-42 (emphasis added). Thus, the court concluded that the contract itself did not "provide that the Port has the right to control the physical manner in which First Transit employees carried out their driving duties" and did not "support the conclusion that First Transit or its employees, including Zavoral, were acting as agents of the Port for purposes of imposing vicarious liability on the Port for the alleged negligence of First Transit's shuttle bus drivers." *Id.*

The ultimate question in this case is similar to that in *Vaughn*: Whether a jury could conclude on this record that Domino's had the right to control the physical details of the conduct that injured plaintiff—namely, the manner in which

Mathias carried out his driving duties. Although this presents a much closer case than *Vaughn* on that question, we nonetheless conclude that plaintiff's evidence falls short of creating a genuine issue of material fact regarding vicarious liability.

Plaintiff contends that, as distinguished from the facts in *Vaughn*, Domino's established stringent controls regarding drivers, their vehicles, and delivery times. Plaintiff sets forth a long list of those "controls":

> "(1) Drivers must be 18 years old and carry a state issued driver's license; (2) Drivers must have proof of insurance; (3) Drivers' Motor Vehicle Records need to be verified at the start of employment and at a minimum of every six months; (4) Drivers cannot have more than two violations in the past two years; (5) An employee who does not meet the standards may only work in a non-driving capacity and then only after signing a 'Non-Driving Agreement'; (6) Drivers cannot drive with 'suspended,' 'provisional,' 'court restricted,' 'revoked,' 'learners permit,' or 'Junior' license; (7) Drivers and riders must wear seat belts; (8) Drivers cannot leave keys in unoccupied vehicles; (9) Tobacco use is not permitted by any driver while on the clock; (10) Drivers cannot use cell phone unless it is a 'hands free' device; (11) Driver Reference Book is required at the driver station; (12) Only team members in full uniform are permitted to deliver orders to customers; (13) Delivery drivers must wear a properly working watch when delivering product; (14) Drivers cannot look for an address when delivering a pizza; (15) Drivers must leave the store within sixty (60) seconds of being given a pizza and deliver it within nine (9) minutes; (16) Drivers can only drive certain types of vehicles, but not motorcycles; (17) Franchises can be terminated for failure to follow driving standards; and (18) Domino's conducts periodic and surprise inspections of franchise vehicles and delivery drivers."

Although each of those "controls" touches on the delivery process, none of them gives Domino's the right to control *the physical details of the manner of driving*. The franchise agreement specifically provides that Zzeeks, not Domino's, is responsible for supervising the conduct of Zzeeks's employees. The fact that Domino's sets age or other hiring limits on drivers is a separate issue from the physical

details of driving; plaintiff alleges that he was injured because of Mathias's driving, not because of any negligence regarding Zzeeks's hiring process. Similarly, the fact that Domino's requires its franchisee's delivery drivers to undergo driving training does not establish control over the physical details of driving, once that training is complete. Again, plaintiff does not contend that Mathias's participation in a training program (or inadequate training program) was the conduct that injured plaintiff. Rather, plaintiff's theory is that Domino's is vicariously liable for Mathias's negligent driving, and plaintiff's evidence must establish more than the fact that Domino's set hiring and training standards for delivery drivers or standards for delivery vehicles. *See Vaughn*, 346 Or at 141 (general hiring standards, including licensing standards, and the right to reject the agent's employees, are not equivalent to a provision expressly retaining the right to control the day-to-day performance of the agent's employees' driving duties).

Nor are we persuaded that a jury could find that Domino's exposed itself to vicarious liability simply by establishing general driving safety standards, such as the requirement that drivers obey the rules of the road, or even the more particularized requirements that drivers use seatbelts and not use cell phones while driving. Setting those standards for a franchisee's employees and having the right to actually control how the franchisee's employees perform the physical details of driving are two different things. *Miller*, 150 Or App at 274 (contrasting franchise agreement that "could only be read as providing standards that the franchisee had to meet" with an agreement that "could be read as retaining the right to exercise control over the franchisee's daily operations"). On that point, the facts in *Miller* provide a helpful contrast. In *Miller*, the negligent conduct at issue pertained to food handling and preparation. The franchisor, McDonald's Corp., established the ways in which its franchisee handled and prepared food, and McDonald's enforced the use of those particular methods through regular inspections and the right to cancel the agreement. 150 Or App at 281. Here, however, Domino's did not establish particularized driving standards regarding the physical details of driving, such as prescribing the route that Zzeeks's employees must take. Rather,

Domino's required that its franchisee's drivers generally obey the rules of the road and drive safely—generalized standards that allowed day-to-day control over the driving operations to remain with Zzeeks, the franchisee.

In sum, the franchise agreement specifically provides that Zzeeks controls the day-to-day performance of its delivery drivers, and that Domino's has no right to control the conduct of those drivers. The fact that Domino's has the ability to protect its interests under the franchise agreement by terminating or suspending the franchisee's operations for violations of driving-related standards does not undermine that unambiguous allocation of control in the franchise agreement. Because the evidence in this summary judgment record establishes that Zzeeks—and not Domino's—had the right to control the physical details of the manner of performance of Mathias's driving, the trial court was correct to grant summary judgment in favor of Domino's.

Affirmed.