Argued and submitted January 11, affirmed August 14, 2013

George L. CHELIUS,
Co-Personal Representative of
the Estate of Alan James,
*Petitioner,*

*v.*

EMPLOYMENT DEPARTMENT,
*Respondent.*

Office of Administrative Hearings
T71232; A148900

308 P3d 290

Matthew Whitman argued the cause and filed the briefs for petitioner.

Judy C. Lucas, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Anna M. Joyce, Solicitor General.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Duncan, Judge.

SCHUMAN, P. J.

## SCHUMAN, P. J.

Petitioner, as one of the personal representatives of the estate of Alan James (the estate), challenges a tax assessment levied by the Tax Section of the Oregon Employment Department. The department found that the estate was liable for unemployment insurance taxes based on payments to Gabaldon, who was providing bookkeeping and related services. The estate (valued at over $110 million) challenged the assessment ($379.16), arguing that Gabaldon was an independent contractor and that, therefore, payments for her services did not subject the estate to liability for unemployment insurance taxes. An administrative law judge (ALJ) for the department issued a final order concluding that Gabaldon was the estate's employee and affirming the department's tax assessment. The estate now appeals that order, and we affirm.

We state the facts consistently with the ALJ's unchallenged factual findings. *McDowell v. Employment Dept.*, 348 Or 605, 608, 236 P3d 722 (2010); *Compressed Pattern, LLC v. Employment Dept.*, 253 Or App 254, 255, 293 P3d 1053 (2012). Gabaldon worked as a full-time employee for Alan James for some time until his death in 2005. She was then hired by the estate to help attend to various matters related to the administration of his estate and to the 16 testamentary trusts that James had established. She helped the estate's representatives prepare for the probate case; helped gather information related to an IRS tax case; acted as the liaison to the beneficiaries and the trustees; and performed other day-to-day bookkeeping tasks. The estate's attorney trained Gabaldon on how to gather the information needed for filing probate inventories and accountings. By 2009, Gabaldon had grown familiar with the requirements of her new job, had obtained a paralegal certificate, and required less supervision than when she started.

By the end of 2009, much of the work associated with the estate had concluded, and the estate closed its offices. Consequently, Gabaldon's workload diminished substantially, and she was allowed to work part time from home. The estate provided her with some of its office furniture, a computer, an external back-up computer hard drive

and battery for storing or backing up estate or trust files, and a printer, all of which she set up in her dining room. The printer, however, stopped working shortly thereafter, and Gabaldon purchased a replacement at her expense.

In December 2009, Gabaldon and the estate entered into an agreement captioned "INDEPENDENT CONTRACTOR AGREEMENT." The agreement provided that Gabaldon would continue to do work on behalf of the estate at the rate of $40 an hour, up to 15 hours per week. It also required her to submit detailed time sheets documenting her work and provided that the estate would reimburse Gabaldon for her out of pocket expenses. The estate could terminate the agreement at any time, provided it sent written notice to Gabaldon. According to the agreement's "Independent Contractor" clause, Gabaldon was to "provide all services under this agreement, as an independent contractor for all purposes" and that the estate's representative-trustees would not "have the right to direct or control the means or manner in which she provides these services * * *." The agreement also made Gabaldon responsible for all taxes and fees "payable on account of the services provided by her under this agreement."

The agreement specified Gabaldon's job responsibilities as follows:

"For the Estate:   Process and pay estate bills; Process and make deposits of estate funds; Reconcile bank statements and manage estate accounts; Process year-end tax documents; Keep the personal representatives informed regarding estate assets and liabilities; Provide information to the accountants and attorneys for the personal representatives; Prepare schedules for annual and final court accountings; Communicate with depositories of estate funds; Maintain the decedent's and the estate records and files[.]

"For the Trusts:   Provide liaison between the trustees and trust beneficiaries; Assemble, organize and verify data and information relating to discretionary distribution requests, and communicate with trust beneficiaries and vendors to the beneficiaries in that connection; Communicate with Wells Fargo re trust account balances and disbursements; Monitor and follow up on due dates for

trustee action; Monitor and follow up on pending matters between the trustees and beneficiaries and between the trustees and Wells Fargo; As reasonably requested, monitor and supervise vendors of services or materials to the trustees; Review Wells Fargo statements of receipts and disbursements for accuracy; Provide the trustees with trust administration, historical and other information as requested; Provide information to the accountants and attorneys for the trustees; Maintain trust administration files; Distribute income tax documents to beneficiaries; Routine communication with beneficiaries regarding trust questions; Make estimated tax payments for the trust and manage when they need to be paid."

Gabaldon had similar responsibilities while she was a full-time estate employee.

The agreement also specified that Gabaldon would "maintain a business location at her residence or elsewhere in Portland, Oregon[,] for providing these services * * *," and provided that, "[i]f the business location is in [Gabaldon's] residence she will use it primarily for the business of providing bookkeeping and administrative services * * *." It also allowed her to hire an assistant at her expense, which she did when she needed help with clerical filing. The agreement took effect in January 2010, at which time the estate stopped paying unemployment insurance taxes on her behalf.

Gabaldon continued to work for the estate from her dining room. She used the computer and printers for both business and personal matters. Although she sometimes ate at the dining room table, she used the dining room for a home office the "majority" of the time.[1] During the time she provided services to the estate, no one else had access to her dining room area. Over the years, there were a few occasions when the estate's representatives noticed mistakes in Gabaldon's work, which they brought to her attention.

_____

[1] The ALJ found that Gabaldon "sometimes used the dining room for eating." During the hearing, she testified, "I have a home office, which I call a home office/ dining room, only because there's a dining room table in there, but it's majority [*sic*] used for my home office." During questioning by the department, she testified that she "very rarely" ate at the dining room table and mostly used the table to "spread out my filing." These statements appear to be the only evidence on this point in the record. We, therefore, construe the ALJ's findings as consistent with Gabaldon's statements.

Gabaldon did not bill the estate for the time she spent correcting those mistakes.

When department employees noticed that the estate was still sending payments to Gabaldon after it had stopped paying unemployment insurance taxes, the department began an investigation into Gabaldon's status as an independent contractor. The department's investigator concluded that Gabaldon was an employee rather than an independent contractor. A person's status as an "employee" determines whether the entity for which that person performs services is an "employer" subject to unemployment insurance taxes, *Avanti Press v. Employment Dept. Tax Section*, 248 Or App 450, 455 n 2, 274 P3d 190 (2012); the department therefore found that the estate was responsible for paying those taxes and assessed the estate a tax bill for $379.16. The estate submitted a timely challenge to the assessment and requested an administrative hearing. An ALJ upheld the assessment, determining that the estate had the right to control and direct Gabaldon's work performance because it "provided the means by which Gabaldon performed her services" and it had the "right to control the manner by which Gabaldon performed the services."

Under ORS 657.040, "[s]ervices performed by an individual for remuneration are deemed to be employment" for unemployment insurance tax purposes unless "it is shown to the satisfaction of the Director of the Employment Department that the individual is an independent contractor." "Independent contractor" is defined by ORS 670.600(2), which provides:

"'[I]ndependent contractor' means a person who provides services for remuneration and who, in the provision of the services:

"(a)   Is free from direction and control over the means and manner of providing the services, subject only to the right of the person for whom the services are provided to specify the desired results;

"(b)   * * * [I]s customarily engaged in an independently established business;

"(c)  Is licensed under ORS chapter 671 or 701 if the person provides services for which a license is required under ORS chapter 671 or 701; and

"(d)  Is responsible for obtaining other licenses or certificates necessary to provide the services."

An employer challenging an assessment has the burden of proving that the person claimed as an independent contractor meets all relevant criteria. *Avanti Press*, 248 Or App at 456. In this case, the ALJ found, and the department does not dispute, that there was no evidence that Gabaldon was required to obtain any licenses or certificates in order to provide her services. Therefore, the only relevant subparagraphs of ORS 670.600(2) are (a) ("means and manner" independence) and (b) (independently established business). Although the ALJ concluded that the estate failed to prove both, the criteria are conjunctive, ORS 670.600(2), so we will affirm if we conclude that the ALJ's determination was correct with respect to either criterion. Because we conclude that the ALJ was correct that Gabaldon was subject to the estate's direction and control over the means of providing services, we do not reach the second issue.

"We review the ALJ's interpretation of the independent contractor definition in ORS 670.600(2)(a) * * * for errors of law." *Avanti Press*, 248 Or App at 459. Moreover, "the necessary implication of our decision in *Avanti*" is that "whether a certain individual meets the statutory criterion of being 'free from direction and control over the means and manner of providing the services, subject only to the right of the person for whom the services are provided to specify the desired results, ORS 670.600(2)(a),' also involves a legal question; it is not a pure question of fact." *AGAT Transport, Inc. v. Employment Dept.*, 256 Or App 294, 301, 305 P3d 122 (2013).

The agencies charged with enforcing statutory provisions that distinguish between employees and independent contractors have adopted an administrative rule, OAR 471-031-0181, to ensure that they are interpreting and applying ORS 670.600 consistently. *See Avanti Press*, 248 Or App at 461-62 (explaining the origins of OAR 471-031-0181). That rule establishes the following test:

"(3)   Direction and Control Test.

"(a)   ORS 670.600 states that an 'independent contractor' must be 'free from direction and control over the means and manner' of providing services to others. The agencies that have adopted this rule will use the following definitions in their interpretation and application of the 'direction and control' test:

"(A)   'Means' are resources used or needed in performing services. To be free from direction and control over the means of providing services an independent contractor must determine which resources to use in order to perform the work, and how to use those resources. Depending upon the nature of the business, examples of the 'means' used in performing services include such things as tools or equipment, labor, devices, plans, materials, licenses, property, work location, and assets, among other things.

"(B)   'Manner' is the method by which services are performed. To be free from direction and control over the manner of providing services an independent contractor must determine how to perform the work. Depending upon the nature of the business, examples of the 'manner' by which services are performed include such things as work schedules, and work processes and procedures, among other things.

"(C)   'Free from direction and control' means that the independent contractor is free from the right of another person to control the means or manner by which the independent contractor provides services. If the person for whom services are provided has the right to control the means or manner of providing the services, it does not matter whether that person actually exercises the right of control."

OAR 471-031-0181(3)(a). As we have noted previously, this test does not require an independent contractor to be free from all direction and control. *Avanti Press*, 248 Or App at 461. The key question, rather, "is whether the party contracting for services maintains control over the 'means and manner' of performance or, instead, gives more generalized instructions concomitant to the 'right of the person for whom the services are provided to specify the desired results[.]'" *Id.* (citations omitted; emphasis in original).

The estate argues that the ALJ's finding that Gabaldon was not free from direction and control was contrary to the evidence in the record. Specifically, the estate points to the independent contractor clause in the agreement, which provides that the estate will not "have the right to direct or control the means or manner in which [Gabaldon] provides these services." According to the estate, we need look no further because, where a written contract "unambiguously cabins off the right to direct and control, the contract should end the inquiry."

We disagree. Although the terms of an employer's contract with a worker are relevant evidence as to the nature of the relationship, and a breach of one of those terms might be remediable as a matter of contract law, the terms cannot bind the decision of the department; otherwise, every employer who wanted to avoid paying unemployment insurance tax and other assessments levied on the basis of the worker's status could do so by the simple expedient of drafting a contract stating the legal conclusion that the worker was not an employee, and then treating the worker exactly as though he or she was one. Likewise, any worker who wanted the employer to provide the required assessments could draft a similarly "conclusive" contract labeling the worker as an employee. The same can be said regarding the weight to be given the testimony of employers and employees insofar as that testimony states a legal conclusion, as opposed to an historical fact. As the Supreme Court has made clear, "[t]he fact that either or both of the parties mistakenly considered their relationship to be that of employer-independent contractor cannot * * * be controlling * * *." *Woody v. Waibel*, 276 Or 189, 198-99, 554 P2d 492 (1976).

In an attempt to distinguish the present case from *Woody*, the estate cites *Butts v. State Ind. Acc. Comm.*, 193 Or 417, 239 P2d 238 (1951). In *Butts*, the Supreme Court found that "[u]nder the Workmen's Compensation Act the right to direct and control the services of any person when such right is specifically contracted for and secured is conclusive evidence of a relationship of employer and employee. OCLA, § 102-1703." *Id.* at 427. According to the estate, *Butts* means that a contract clause that specifically *disclaims* the right to direct and control the services of another must also

be conclusive evidence. *Butts*, however, is inapposite for several reasons.

First, the court's holding that a contract term specifying an employer-employee relationship is conclusive of that relationship does not logically establish that a contract specifying that a worker is *not* an employee has a similarly conclusive effect. In fact, Oregon law explicitly makes it more difficult to classify a person as an independent contractor than as an employee.

Second, the relevant language from *Butts* applies to the statutory scheme under the then-existing Workmen's Compensation Act, not to any matter relating to unemployment tax, and, furthermore, it relies on OCLA § 102-1703, a statute that has since been amended numerous times and, ultimately, repealed. Third, the language itself, even if it were still in existence, dealt with the "independent business" aspect of employer-worker relationships, not "right of control":

> "'If any person engaged in a business and subject to this act as an employer, in the course of such business shall let a contract the principal purpose of which is the performance of labor, such labor to be performed by the person to whom the contract was let or by such person with the assistance of others, all workmen engaged in the performance of the contract shall be deemed workmen of the person letting the contract, if the person to whom the contract was let was not engaged in a separate business involving the occupation covered by the contract at the time of commencing the performance of the contract.'"

*Butts*, 193 Or at 427 (quoting OCLA § 102-1703).

Finally, the estate's assertion that the contract controls over facts as found by the agency cannot be reconciled with a variety of cases dealing with that issue in other contexts. *See, e.g., Schaff v. Ray's Land & Sea Food Co., Inc.*, 334 Or 94, 103-04, 45 P3d 936 (2002) (dealership agreement providing that a wholesaler had no right to control dealer's "mode of doing business" was not dispositive of worker's employment status); *Jenkins v. AAA Heating*, 245 Or 382, 385, 421 P2d 971 (1966) (in personal injury action, language defining salespersons as independent contractors

is "of evidentiary value concerning the relationship, but not necessarily binding upon third parties"); *Oregon Festival of American Music v. Emp. Dept.*, 204 Or App 478, 130 P3d 795 (2006) (musicians were employees even though they signed "Artist Service Agreements" providing that they were independent contractors for tax purposes); *Viado v. Domino's Pizza, LLC*, 230 Or App 531, 548, 217 P3d 199 (2009), *rev den*, 347 Or 608 (2010) (franchise agreement providing that the franchisor "does not have the legal right to direct [franchisee's] employees in the operation of the Store" was not dispositive).

We conclude that, rather than depending on terms of an employment contract, "the test for whether one is an employee or an independent contractor is quite fact specific." *Cantua v. Creager*, 169 Or App 81, 92, 7 P3d 693 (2000).

The relevant administrative rule, OAR 471-031-0181, explains that there are two components to the right to control test: the means of providing services and the manner of providing services. Examples of the means of providing services include "tools or equipment, labor, devices, plans, materials, licenses, property, work location, and assets." OAR 471-031-0181(3)(a)(A). Because it is dispositive, we begin with that component. We reemphasize (1) that the estate had the burden of proving that it did not have direction and control over the means of providing the services, (2) that the relevant facts are undisputed, and (3) that we review the department's conclusion that the estate failed to carry its burden of proof for legal error.

The following undisputed facts establish that the department did not err. The estate provided Gabaldon with "file cabinets and an external back-up computer hard drive and battery backup for storing or backing up estate or trust files," and it also reimbursed her for cell phone use, a post office box, postage, copying, mileage, and such office supplies as paper, folders, ink, toner, and storage boxes. It also reimbursed her for "out-of-pocket expenses incurred in providing services under this agreement[.]" Upon termination of the agreement, Gabaldon was required to return "the file cabinets, files and external back up hard drive and battery backup and all other property owned by the estate * * *."

The estate's possession of those resources upon termination of the agreement, coupled with its right to terminate the agreement, amount to "control" of them. The estate also maintained control and direction as to the "work location," OAR 471-031-0181(3)(a)(A), by requiring her to work from Portland and by specifying how, if she were to work from a room in her home, that room could be used: "If the business location is in [Gabaldon's] residence she will use it primarily for the business of providing booking and administrative services to others including but not limited to [the personal representatives of the estate]." Finally, all of Gabaldon's tasks were a continuation of tasks that she learned to perform under the direction of the estate while she was clearly a full-time employee, and she did not work for any other employer while working for the estate.

Although this is a close case (as the department conceded at oral argument), consideration of the relevant factors leads us to agree with the ALJ that the estate did not carry its statutorily imposed burden of proving that it did not control the means by which Gabaldon performed services to the estate.

Affirmed.